# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **BARBARA C. WASHINGTON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 09 CV 4484** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Young B. Kim** |
| *Commissioner of Social Security,* | ) | |
| | ) | |
| Defendant. | ) | **September 1, 2010** |

## MEMORANDUM OPINION and ORDER

Before the court is the motion of plaintiff Barbara Washington ("Washington") for summary judgment. Washington seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Washington asks the court to reverse the Commissioner's decision and award benefits, or in the alternative, remand the decision for further proceedings. For the following reasons, the motion is granted to the extent that the cause is remanded for further proceedings consistent with this opinion:

### Procedural History

Washington applied for DIB and SSI on December 20, 2004, alleging that she became disabled on March 30, 2004, due to migraine headaches, dizziness, slurred speech, stroke, and numbness. (Administrative Record ("A.R.") 69-70.) Her applications were denied

initially on May 11, 2005, (id. at 71-75), and again on reconsideration on July 6, 2005, (id. at 76-80). Thereafter, Washington filed a timely request for a hearing on August 26, 2005. (Id. at 81.)

An administrative law judge ("ALJ") held a hearing on May 3, 2007. (A.R. 392-447.) Washington appeared and testified at the hearing. (Id. at 396.) Dr. Eric Ostrov, a medical expert ("ME"), and Glean Kehr, a vocational expert ("VE"), also appeared and testified at the hearing. (Id. at 411, 420.) On June 11, 2007, the ALJ issued a decision finding Washington not disabled. (Id. at 61-68.) Washington then requested a review of the ALJ's decision, (id. at 53), and on September 28, 2007, the Appeals Council granted the request, (id. at 42-44). The Appeals Council vacated the ALJ's decision and remanded the case for the purpose of considering an April 19, 2007 medical report and ordering a neuropsychological assessment. (Id. at 43-44.)

The ALJ held a second hearing on October 22, 2008, at which Washington appeared and testified. (A.R. 448-84.) Dr. Walter Miller, an ME, and James Breen, a VE, also appeared and testified. (Id. at 467, 481.) On November 10, 2008, the ALJ issued a second decision again finding Washington not disabled. (Id. at 23-30.) Washington again requested a review of the ALJ's decision, (id. at 19), and on May 28, 2009, the Appeals Council denied her request making the ALJ's decision the final decision of the Commissioner. (Id. at 8-9.) Pursuant to 42 U.S.C. § 405(g), Washington initiated this civil action for judicial review of

the Commissioner's final decision. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**Facts**

A.    **Medical Evidence**

In March 2004, Washington sought emergency medical treatment for dizziness, which she described as feelings of vertigo and lightheadedness. (A.R. 222-26.) She reported having episodes of dizziness for two days with her first episode occurring while she was working as a bus driver for the Chicago Transit Authority ("CTA"). (Id. at 223.) She thought objects seemed to be tilted in front of her. (Id.) Washington also felt as if she lost her memory earlier in the day, but that had since subsided. (Id.) She described periodic episodes of numbness in her left scalp, face, arm, and leg, blurry vision, a left parietal headache, and slight shortness of breath. (Id.)

The records from her March 2004 hospitalization indicate that Washington had been experiencing similar episodes of dizziness and left-sided numbness for more than eight years. (A.R. 223.) She previously underwent extensive medical testing, which included computed tomography ("CT"), magnetic resonance imaging ("MRI"), and electroencephalography ("EEG") studies to evaluate her condition, but no etiology was identified. (Id.) A physical examination and CT of the head/brain did not reveal any abnormal findings. (Id. at 223-24, 226.) Washington was diagnosed as having acute dizziness and left hemisensory parathesia of an unknown etiology. (Id. at 224.)

Several weeks later, in April 2004, Washington complained to Dr. Konstantin Dzamashvili, a neurologist, that she had numbness and tingling in her left side, difficulty in "putting words together," dizziness, and migraine headaches. (A.R. 244.) Her neurological examination that day was unremarkable. (Id.) Washington underwent an MRI of her head/brain, (id. at 247), and an electromyography ("EMG"), which produced normal results, (id. at 253-55). Dr. Dzamashvili assessed Washington with hemiparesthesia and dizziness. (Id. at 244.)

Dr. Dzamashvili saw Washington a few more times and in June 2004, Washington complained that she continued to experience dizziness and heaviness of her head. (A.R. 236.) She also explained that she "blacked out" while driving and caused a car accident. (Id.) However, her neurological examination and EEG showed normal results. (Id. at 236, 238.) Dr. Dzamashvili concluded that Washington suffered from syncope of an unknown etiology, referred her for vestibular physical therapy, and restricted her from driving. (Id. at 234, 236, 238, 244.) Further testing and examination the following month did not reveal any abnormalities. (Id. at 232-33, 303-04.)

Washington next attended a consultative examination in April 2005, with Dr. Stanley Rabinowitz. (A.R. 256-58.) She explained to Dr. Rabinowitz that she developed numbness on the left side of her body and slurred speech in 1995. (Id. at 256.) About nine years later in 2004, Washington began experiencing dizziness and also had periods of memory loss. (Id.) She reported that she had been treated for her symptoms, but the results of her

diagnostic tests did not indicate any abnormal findings. (Id.) She was taking Nortriptyline for her dizziness. (Id.) Dr. Rabinowitz's neurological and musculoskeletal examinations of Washington also showed normal findings. (Id. at 257-58.)

About three weeks later, in May 2005, Washington sought emergency medical treatment for intermittent episodes of dizziness and numbness on the left side of her body. (A.R. 269.) Her physical examination did not indicate any abnormal findings. (Id. at 269-70.) Washington's CT of her head/brain and heart electrocardiography ("EKG") were also within normal limits. (Id. at 270.) She was diagnosed as having chronic and recurrent vertigo. (Id.) Additional testing in July 2005 did not reveal any abnormalities, with the exception of an elevated sedimentation rate. (Id. at 339-48.)

The following year, in March 2006, Washington sought emergency medical treatment for back pain, leg numbness, headaches, and dizziness. (A.R. 274-80.) An x-ray of her lumbar spine did not reveal any abnormalities. (Id. at 271.) Washington also underwent a CT of her head/brain. (Id. at 272.) However, there was no acute or significant intracranial or calvarial pathology noted. (Id.)

Later in March 2006, Washington met with Dr. Ari Rubenfeld, an otolaryngology specialist. (A.R. 376-77.) Washington complained of dizziness, vertigo, feeling off balance, numbness on the left side of her body, and left-sided headaches. (Id. at 376.) She told Dr. Rubenfeld that she becomes fatigued before each episode and each episode lasts from several minutes to several days. (Id.) Washington explained that she hit her head on a

freezer door about ten years earlier, which caused numbness of her scalp, but she did not feel any dizziness until just two years earlier.  (Id.)  Upon examination, Dr. Rubenfeld found Washington's ear, nasal, and oral examinations unremarkable, but observed that she was always leaning and catching herself on the right side.  (Id.)  An audiogram and an electronystagmography ("ENG") were ordered to assess the etiology of Washington's condition.  (Id. at 377.)

In May 2006, the results of Washington's audiogram indicated that she has normal bilateral hearing, (A.R. 378), but the ENG was abnormal secondary to up-beating nystagmus which was present in all positions, (id. at 379).  Shortly thereafter, Washington complained to Dr. Rubenfeld that she had severe dizziness during the past three to four days.  (Id. at 375.)  Dr. Rubenfeld noted that Washington's ENG results showed nystagmus secondary to a central cause and that she would follow up with her neurologist to rule out multiple sclerosis.  (Id.)  He also noted that she needed vestibular rehabilitation physical therapy.  (Id.)

In October 2006, Washington had a physical therapy evaluation at Schwab Rehabilitation Hospital.  (A.R. 323-25.)  At that time, Washington explained that she was only able to walk a few feet before she became dizzy, and if she walked more than one block, she felt unsafe to continue because of her dizziness.  (Id. at 323.)  She listed Lorazepam as one of her medications.  (Id. at 324.)  Testing that day showed a Berg Balance Scale score of 50/56, with lower extremity weakness which was greater on the left than the right and decreased ankle strategies for balance recovery which are greater on the left than the right.

(Id.) Washington's diagnoses included impaired functional mobility secondary to leg weakness and dizziness. (Id. at 323-24.) She was referred for physical therapy for functional training, neuromuscular re-education, balance activities, and therapeutic exercise. (Id.)

In 2007, Dr. Rubenfeld treated Washington on three separate occasions. (A.R. 370-73.) Dr. Rubenfeld's January 2007 treatment notes indicate that Washington never received her vestibular rehabilitation therapy and that she was still having episodic dizzy spells. (Id. at 373.) She reported that she sometimes felt fullness in her ear and that her dizziness was fierce enough to cause her to fall off of a chair. (Id.) Dr. Rubenfeld prescribed Dyazide for ear fluid and a low-salt diet of 2000 milligrams per day to assess if Washington suffered from Meniere's disease.[1] (Id.)

In a follow-up appointment in April 2007, Washington told Dr. Rubenfeld that her symptoms had improved. (A.R. 372.) Washington explained that she feels pressure in her ears when she eats salty meals and her dizziness made her feel as if she is tilting over. (Id.) Dr. Rubenfeld's diagnosis was Meniere's disease and he prescribed nutritional supplements in addition to medication and a low-salt diet. (Id.)

About five months later, in October 2007, Washington complained to Dr. Rubenfeld that she was having episodes of dizziness about two times per month. (A.R. 371.) She explained that her most recent episode lasted for several hours and was debilitating. (Id.)

---

[1]  Meniere's disease is a condition involving "vertigo, nausea, vomiting, tinnitus, and fluctuating and progressive sensory hearing loss associated with endolymphatic hydrops." STEDMAN'S MEDICAL DICTIONARY 561 (28th ed. 2006).

Dr. Rubenfeld continued Washington's medication and referred her to Dr. Miriam Redleaf, a neuro-otologist specialist, to consider surgical options, including endolymphatic sac decompression. (Id.)

In November 2007, Dr. Redleaf evaluated Washington. (A.R. 370.) Treatment notes indicate that Washington experienced spinning sensations twice per month, but that these episodes typically lasted for only a day. (Id.) Dr. Redleaf reported that after Washington has a salty meal, she is unsteady the following day, but that when she adheres to a low-salt diet and takes her medication, she does rather well. (Id.) She also noted that Washington has fewer episodes when she takes only one college course instead of two. (Id.) Dr. Redleaf told Washington that endolymphatic sac surgery might reduce her episodes, but explained that there were risks which she needed to consider before pursuing the surgical option. (Id.)

Washington underwent another consultative examination in January 2008, with Dr. Alan Long, a licensed clinical psychologist. (A.R. 356-61.) Washington explained to Dr. Long that she had been diagnosed with Meniere's disease, and that she had "drop attacks" in 2006 related to her disease. (Id. at 356.) She stated that she had to choose between working and going to school because when she did both, she experienced dizzy spells. (Id.) Dr. Long noted that Washington was taking two online college courses from home and would be taking another course at her local college. (Id.)

Dr. Long gave Washington the Luria-Nebraska Neuropsychological Battery, a standardized test used to measure and evaluate neurological dysfunction resulting from a

disease or injury. (A.R. 357-58.) Washington's test results showed a normal profile. (Id. at 357.) Dr. Long opined that her disease did not affect Washington's ability to understand, remember, and carry out instructions, her ability to interact appropriately with supervisors, co-workers, and the public, and her ability to respond to changes in a routine work environment. (Id. at 359, 360.) However, he noted that Washington's disease interfered with her ability to balance. (Id. at 360.)

Dr. Rubenfeld treated Washington twice more in 2008. (A.R. 368, 369.) In February 2008, Washington reported that she had been feeling well except for a dizzy spell she had earlier that month. (Id. at 369.) Her ear examination was unremarkable and she had no nystagmus. (Id.) Treatment notes indicate that Washington "does not want surgery yet." (Id.) Dr. Rubenfeld's treatment plan included Dyazide, a low-salt diet, and scopolamine patches. (Id.)

In August 2008, Washington reported to Dr. Rubenfeld that in June 2008, she began having dizzy spells again and felt fullness in her ear. (A.R. 368.) Treatment notes show that Washington was selling Avon products online and taking online college courses. (Id.) She was being cautious with her sodium intake and taking Dyazide to control her symptoms. (Id.) An ear examination that day showed that the tympanic membranes were normal bilaterally and there was no nystagmus. (Id.) Dr. Rubenfeld assessed Washington as having poorly controlled Meniere's disease and recommended that she reconsider her surgical options. (Id.)

He also informed Washington that he was leaving his position and that she needed to follow-up with Cook County Hospital in the future as she lacked medical insurance. (Id.)

In October 2008, Dr. Rubenfeld completed a Meniere's Disease Residual Functional Capacity ("RFC") Questionnaire. (A.R. 362-66.) In filling out the questionnaire, he noted that his diagnosis of Meniere's disease was based on a disturbed function of vestibular labyrinth as demonstrated by caloric and other vestibular tests. (Id. at 362-63.) Dr. Rubenfeld noted that Washington's symptoms included vertigo, nausea, vomiting, and tinnitus. (Id.) He indicated that Washington has four to five attacks of balance disturbance each week and that her attacks are so severe that they caused her to fall out of a chair. (Id. at 362-64.) Dr. Rubenfeld further indicated that Washington did not always have warning of an impending attack and the attacks did not occur at any particular time of the day and that her impairments were reasonably consistent with her symptoms and functional limitations. (Id. at 363-64.) He noted her poor response to his treatment plan which consisted of Dyazide, a low sodium diet, and herbal supplements. (Id. at 364.) Dr. Rubenfeld did not find Washington as a malingerer. (Id.)

In assessing Washington's RFC, Dr. Rubenfeld indicated that when Washington has an attack, she could not perform even basic work activities and would need a break from the workplace. (A.R. 365.) He noted that she would sometimes need to take unscheduled breaks during an 8-hour working day. (Id.) Dr. Rubenfeld explained that Washington would have both good and bad days, and her absenteeism from work would be dependent on the

frequency of her attacks.  (Id.)  He rated her prognosis as being poor, (id. at 365), and indicated that she "can't work," (id. at 364).  However, Dr. Rubenfeld opined that if her symptoms could be controlled she would not be limited from working.  (Id. at 366.)

## B.    Washington's Testimony

Washington was born on April 25, 1976, and was 32 years old at the time of the October 22, 2008 administrative hearing.  (A.R. 452.)  She had completed some college courses and was working toward a degree in health administration.  (Id. at 452-53.)  Washington worked selling Avon products online two to eight hours a week, but the most she earned was $300 a month.  (Id. at 453-54.)  This was her only source of income.  (Id. at 460.)  Washington was last employed on a full-time basis in 2004, when she worked as a CTA bus driver.  (Id. at 453-54.)  Washington testified that she lives with her mother and that her mother supports her.  (A.R. 460.)  She stated that she is able to attend to her own personal hygiene, prepare meals, and drive a car.  (Id. at 461-62.)  Her driver's license, however, was suspended in 2004 after she caused a car accident.  (Id. at 462.)

Washington stated that she can sit for a couple of hours, stand for no more than a couple of hours, and walk about half a block.  (A.R. 460-61.)  She can bend down and move around on her hands and knees, but this causes her to become a "little dizzy."  (Id. at 462.)  Washington is able to reach up, out and in front of her body with both arms, and she can press her thumbs to her fingers on each hand.  (Id.)  She stated that she can lift and carry about 20 pounds, push and pull 20 pounds, and grasp or hold up to 20 pounds with either

11

hand. (Id. at 462-63.) Washington can pick up small items, including coins, paperclips, rubber bands, paper or a keyboard without any difficulty. (Id. at 463.) She is also able to operate a keyboard about eight hours each week to sell Avon products, use the internet to complete assignments for her online college courses, and access her e-mails. (Id. at 463-64.)

Washington testified that the week before the hearing she was on bed rest for three days due to the severity of her dizziness. (A.R. 470-71.) During the month prior to the hearing, she had been on bed rest a total of nine days, and her dizziness had worsened during the last several months. (Id.) She stated that she initially experienced dizziness in June 2004, and every month since that time, with the exception of the last several months, she has experienced dizziness so debilitating she was required to be on bed rest one to two times each month. (Id. at 472.)

Washington stated that between 2004 and 2006 she was treated several times in emergency rooms for her dizzy spells. (A.R. 465-66.) These spells typically entailed a loss of attention and concentration during which she would become very dizzy and everything felt off balance. (Id. at 465.) When she experienced these spells, her left side became numb and her verbal communication incoherent. (Id.)

Washington testified that when she is stressed she has dizzy spells. (A.R. 474.) Her dizzy spells affected her college course work because her assignments would often be late due to her need to be on bed rest. (Id.) Washington had fewer dizzy spells when she dropped

from two colleges courses to only one course. (Id.) She use to attend a local college, but because of her spells, she now takes online college courses. (Id. at 475.)

Washington does not have problems with her vision, hearing, sense of smell, breathing, swallowing, sense of touch, or speech. (A.R. 464.) However, she is allergic to Meclizine (medication used to treat dizziness) and cats. (Id.) Loud noises, which include people clapping, and auditorium and car speakers can also cause Washington to become dizzy. (Id. at 467.) She also becomes dizzy when walking through the hallway of her house in the dark. (Id.)

Washington testified that she discussed surgical options with Dr. Redleaf. (A.R. 478.) Dr. Redleaf explained to Washington that she did not recommend surgery because it would not cure Meniere's disease and would only temporarily help the dizziness and the feeling of being off balance. (Id.) On the other hand, the risks of the surgery included infection and loss of hearing. (Id.) Dr. Redleaf advised Washington to consider the surgery option seriously because, even though her hearing was fine right now, if the disease got worse, Washington could eventually lose her hearing. (Id. at 479.)

Washington testified that she suffers from daily tinnitus, which is a high-pitched piercing noise in her ears. (A.R. 479, 480.) The tinnitus initially began in her left ear and later affected her right ear. (Id. at 480.) Dr. Rubenfeld explained to her that the disease was getting worse and because she has not responded to his treatment plan, he recommended that she again discuss surgery with Dr. Redleaf. (Id. at 480-81.)

## C.    Medical Expert's Testimony

After reviewing Washington's medical records, Dr. Miller stated that he could not find a diagnosis of Meniere's disease in any of her records.  (A.R. 468-69.)  Dr. Miller also stated that Washington did not have an impairment that meets or equals an impairment listed in or medically equal to one listed in the regulations.  (Id. at 469.)  *See* 20 C.F.R. § 404, Subpt. P, App. 1.  But he explained that he neither treated nor diagnosed patients with Meniere's disease.  (Id.)

## D.    Vocational Expert's Testimony

Breen stated that Washington's past work consisted of jobs as a bus driver, cashier, housekeeper, security guard, and stock person.  (A.R. 481-82.)  Breen explained that, according to the Dictionary of Occupational Titles, the bus driver job is semi-skilled medium work, the cashier and housekeeper jobs are unskilled light work, the security guard job is semi-skilled light work, and the stock person job is unskilled medium work.  (Id.)

The ALJ asked Breen whether a hypothetical person of Washington's age, education, and work experience who has certain physical limitations could perform her past relevant work or any other work in the economy.  (A.R. 482.)  Breen stated that the hypothetical person the ALJ described could perform Washington's past relevant work as a cashier and security guard.  (Id. at 483.)  He further testified that an employer's customary tolerance regarding an employee's absence from work would typically be about 10 to 12 days per year.

(Id. at 484.)  Therefore, if an individual missed work more than once a month due to dizziness, that individual would not be able to retain these jobs.  (Id. at 483-84.)

**E.    The ALJ's Decision**

On November 10, 2008, the ALJ issued a decision finding that Washington was not disabled within the meaning of the Act.  (A.R. 23-30.)  The ALJ initially determined that Washington had met the insured status requirements under the Act through December 31, 2009.  (Id. at 25.)  Next, the ALJ found that Washington had not engaged in substantial gainful activity since March 30, 2004—the alleged onset date of her disability.  (Id.)

The ALJ found that the medical evidence established that Washington suffered from a history of dizziness and Meniere's disease.  (A.R. 25-26.)  However, the ALJ determined that Washington did not have an impairment or combination of impairments listed in or medically equal to one listed in the regulations.  *See* 20 C.F.R. § 404, Subpt. P, App. 1.  (Id. at 27.)  The ALJ then assessed Washington's RFC to determine what work she could perform despite her limitations.  (Id.)  The ALJ found that Washington has the RFC to perform light work with certain limitations.  (Id. at 27-28.)  The ALJ determined that Washington could lift and carry 20 pounds, sit for six hours in an eight-hour workday, with a sit/stand option, could not climb ladders, ropes, or scaffolds, and also could not crouch or crawl.  (Id. at 27.)  The ALJ also found that Washington could occasionally balance, stoop, or kneel but that she must avoid concentrated exposure to fumes, odors, dusts, gases, or poor ventilation.  (Id.)

The ALJ considered Washington's medical history and her hearing testimony. (A.R. 28-29.) The ALJ found Washington's allegations of disabling limitations not credible for a number of reasons. (Id. at 28.) The ALJ first considered the fact that Washington has been working even though she had no reported income. (Id.) Next, the ALJ found that Washington's alleged impairments were not supported by the medical records because the various tests and studies had produced normal results. (Id.) The ALJ noted that Washington testified that she had recently been on bed rest, but no doctor had prescribed bed rest. (Id. at 28, 471.) The ALJ further considered the fact that Washington did not follow-up on the recommended vestibular rehabilitation physical therapy. (Id. at 28.)

The ALJ gave little weight to Dr. Rubenfeld's October 10, 2008 opinion that Washington "can't work," because she was attending college and working for Avon. (A.R. 29, 364.) The ALJ found Dr. Rubenfeld's opinion inconsistent with the medical records. (Id. at 29.) He explained that while Dr. Rubenfeld cited that Washington has balance problems four to five times a week and responded poorly to treatment, medical records from 2007 and 2008 show that her condition improved with medication and a low-salt diet. (Id. at 29, 362, 364.) The ALJ also discussed the fact that Washington did not follow-up with the recommended vestibular rehabilitation physical therapy which could have alleviated some of her problems. (Id. at 29.) He went on to explain that, contrary to Dr. Rubenfeld's opinion, there was no evidence that Washington's condition caused her to fall out of a chair, or that

her attacks worsened with stress. (Id. at 29, 364.) The ALJ further noted that Washington's psychological evaluation showed her to be mentally stable. (Id. at 29.)

The ALJ concluded that Washington was capable of performing her past relevant work as a cashier and security guard. (A.R. 29.) In reaching this conclusion, the ALJ relied on Breen's testimony that in accordance with the DOT, these jobs constitute light unskilled work. (Id.) Therefore, notwithstanding Washington's limitations, the ALJ determined that a significant number of jobs existed in the national economy that she could perform. (Id.)

## Analysis

Washington seeks reversal or remand of the ALJ's decision finding that she is not disabled. Upon review of the record and applying the applicable standards, the court finds that Washington is entitled to a remand because the ALJ failed to make proper RFC and credibility assessments, and improperly relied on Breen's testimony in finding that Washington could perform sustained work on a full-time basis. However, the ALJ adequately explained the basis for the weight he accorded Dr. Rubenfeld's opinion.

## A. Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one: the court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not

reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether a plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, and the error is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the court "must do more than merely rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted). In order for the court to affirm a denial of benefits, the ALJ must have articulated the reasons for the decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion." *Id.* Although an ALJ need not address every piece of evidence, the ALJ cannot limit his decision to only that evidence which supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

## B. Five-Step Inquiry

To qualify for DIB and SSI under Titles II and XVI, a claimant must establish that she has a disability within the meaning of the Act.[2] 42 U.S.C. §§ 423(a)(1)(D), 1382(a). An individual is "disabled" if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations set forth a five-step sequential inquiry for determining whether a claimant is disabled. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citing 20 C.F.R. § 404.1520).

An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at

---

[2] The regulations governing the determination of disability for DIB are set forth at 20 C.F.R. § 404.1501 *et seq.* The SSI regulations, which are nearly identical to the DIB regulations, are found at 20 C.F.R. § 416.901 *et seq.*

352. A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. And, if the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant— in light of her age, education, job experience and RFC to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

## C.    Dr. Rubenfeld's Opinion

Washington contends that the ALJ erred by failing to follow applicable regulatory requirements in evaluating Dr. Rubenfeld's October 10, 2008 opinion. (Pl.'s Mem. at 4-9.) Washington avers that the ALJ was required to analyze specific regulatory factors to determine the weight to be assigned to Dr. Rubenfeld's opinion. (Id.) Washington argues that if Dr. Rubenfield's opinion is not entitled to controlling weight, it is entitled to deference because he is an otolaryngology specialist who treated her for more than two years and there is no medical evidence in the record contradicting his opinion. (Id.) The Commissioner, on the other hand, defends that the ALJ properly discounted Dr. Rubenfeld's opinion because it is not supported by objective medical findings and is inconsistent with other substantial evidence in the record. (Def.'s Resp. at 3-6.)

The court finds that the ALJ adequately explained his basis for the weight he attributed to Dr. Rubenfeld's opinion. The regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) it "is not inconsistent with the other substantial evidence" in the case. 20 C.F.R. § 404.1527(d)(2); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2. If a treating physician's opinion is not entitled to controlling weight, it is afforded deference and must be weighed accordingly using the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion, including medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating physician; and (6) any other factors which tend to support or contradict an opinion. 20 C.F.R. § 404.1527(d)(2)-(6). An ALJ may reject a treating physician's opinion if the opinion is unsupported or inconsistent with the evidence in the record, but if the ALJ rejects the opinion, he must give a good reason. 20 C.F.R. § 404.1527(d)(2); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Here, the ALJ first explained that he was not required to accept Dr. Rubenfeld's opinion that Washington "can't work" because the issue of whether a claimant is disabled or unable to work is one that is expressly reserved for the Commissioner. *See* 20 C.F.R.

§ 404.1527(e)(1). Next, the ALJ discredited Dr. Rubenfeld's opinion that she was unable to work because she was attending college and selling Avon products at the time of the hearing. Washington points out that the ALJ failed to explain that she worked for Avon from home only two to eight hours per week, and took online college courses because her disease kept her from attending classes on campus. But the ALJ reasonably found that her school and work activities are inconsistent with Dr. Rubenfeld's opinion because Washington admitted that she would work on a computer for extended periods of time. Accordingly, the ALJ adequately explained his finding that record evidence conflicts with Dr. Rubenfeld's opinion that she "can't work."

The ALJ also found that Dr. Rubenfeld's October 10, 2008 opinion is inconsistent with the medical records. The ALJ explained that while Dr. Rubenfeld reported that Washington has balance problems four to five times a week and responded poorly to treatment, the medical records from 2007 and 2008 do not support his report. Washington herself testified that she gets dizzy an average of one to two times each month. (A.R. 472.) Next, the ALJ reasonably relied on Dr. Rubenfeld's treatment notes reporting that Washington's condition had improved with medication and a low-salt diet. For instance, in April 2007, Washington reported to Dr. Rubenfeld that her symptoms had improved with medication and she had less dizziness. (Id. at 372.) She also indicated that she felt pressure in her ears when she ate salty meals. (Id.) In November 2007, Dr. Redleaf reported that after Washington has a salty meal, she is unsteady the following day, but when she adheres to a

22

low-salt diet and takes her medication, she does rather well. (Id. at 370.) Furthermore, in February 2008, Washington told Dr. Rubenfeld that she was feeling well with the exception of a dizzy spell she had earlier that month. (Id. at 369.) While Dr. Rubenfeld's treatment notes also indicate that Washington continued to have episodic dizziness and her condition waxed and waned, it was not unreasonable for the ALJ to rely on the records showing that her condition had improved with treatment.

Furthermore, the ALJ reasonably discounted Dr. Rubenfeld's opinion because there was no objective medical evidence supporting his assertion that her condition caused her to fall out of a chair or that her attacks worsened with stress. The ALJ also appropriately noted that Washington failed to follow-up on Dr. Rubenfeld's recommended vestibular rehabilitation physical therapy, which could have alleviated some of her problems. Therefore, the ALJ properly explained the reasons for rejecting Dr. Rubenfeld's opinion.

## D. RFC Finding

Washington next asserts that the ALJ made independent medical findings when he rejected Dr. Rubenfeld's opinion and failed to explain the basis for the limitations he defined in his RFC finding. (Pl.'s Mem. at 7-8, Pl.'s Reply at 3.) Washington contends that the ALJ simply rejected Dr. Rubenfeld's opinion and failed to cite to specific medical and nonmedical evidence to support his RFC finding. (Pl.'s Reply at 3.) The Commissioner, however, contends that the RFC assessment is a legal rather than a medical determination that is expressly reserved for the agency. (Def.'s Resp. at 6.) The Commissioner points out that the

RFC finding is not based on any single opinion and the agency need not accept only physicians' opinions. (Id.)

The court finds that the ALJ failed to make a proper RFC assessment and a remand on this issue is warranted. SSR 96-8p states in relevant part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7; *see also Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments . . . and may not dismiss a line of evidence contrary to the ruling.").

Here, the ALJ simply rejected Dr. Rubenfeld's opinion and never articulated what evidence he relied on in assessing Washington's RFC. He also failed to address Washington's daily activities, the fact that she took college courses online instead of taking courses on campus, or that she needed to be on bed rest one to two days per month. Furthermore, the ALJ failed to consider the nature of Washington's Meniere's disease, which produced symptoms that waxed and waned, in assessing her ability to work on a sustained basis. Accordingly, the ALJ's RFC finding is insufficient because he did not explain the

basis for his RFC finding by citing specific medical and nonmedical evidence to support his conclusion that Washington can perform her past relevant work. *See* SSR 96-8p ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

**E.      Credibility Finding**

Washington argues that the ALJ committed a number of reversible errors in finding her not credible. (Pl.'s Mem. at 9-15.) Washington contends that the ALJ did not properly consider her credibility as required by applicable regulations and offered flawed reasons for finding her not credible. (Id.) Washington also asserts that the ALJ failed to consider and discuss her daily activities, the duration, frequency, and intensity of her symptoms, those factors that precipitate or aggravate her symptoms, her treatment and medication, and any measures she uses to relieve her symptoms in assessing her credibility. (Id.)   The Commissioner defends that the ALJ properly considered Washington's subjective complaints of disabling symptoms and found they were not fully credible. (Def.'s Resp. at 6-9.)  The Commissioner notes that objective medical evidence does not support Washington's claims, that she failed to follow-up on the recommended vestibular rehabilitation physical therapy, that her ability to sell Avon products online and take online college courses contradict her claim of disability. (Id. at 7-8.)

The court finds that the ALJ erred in his credibility assessment of Washington's testimony and that a remand on this issue is warranted. An ALJ's credibility finding will be afforded "considerable deference" and overturned only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted). "A credibility assessment is afforded special deference because an ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). However, where the credibility determination is based on objective factors rather than subjective considerations, an ALJ is in no better position than the court and the court has greater freedom to review it. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

SSR 96-7p instructs that the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2; *see also Brindisi ex. rel. Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003). Without an adequate explanation, neither the claimant nor subsequent reviewers will have a fair sense of how the claimant's testimony is weighed. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Therefore, where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," an ALJ's credibility determination will not be upheld. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Here, the ALJ found that Washington's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC assessment. (A.R. 28.) In his decision, the ALJ lists four reasons for finding Washington's allegations not credible:

> The claimant is currently working, but with unreported income.
>
> Alleged impairments are not supported by medical records. She testified that she was on bed rest recently for several days.
>
> Tests and studies do not support allegations. Brain/Head testing was normal. EEG was normal.
>
> The claimant refused physical therapy as recommended.

(Id.) As a threshold matter, the ALJ's reasons for rejecting Washington's testimony are insufficient as a matter of law and do not articulate a cogent basis for finding her testimony not credible. Here, the ALJ failed to explain with the requisite specificity how these four reasons led him to reject Washington's testimony. *See* SSR 96-7p. Furthermore, the reasons given by the ALJ for finding Washington's allegations not credible are flawed.

The ALJ first discredits Washington's testimony because at the time of the hearing she was working for Avon, but did not report any income. (A.R. 28.) The ALJ, however, mischaracterizes the nature of Washington's employment as she worked from home selling Avon products online about two to eight hours per week and she did not earn more than $300 in a month. (Id. at 453-54.) Furthermore, while the ALJ finds Washington lacks credibility because she has unreported income, the ALJ fails to identify any record support for that

contention nor did this court find any in its independent review of the record. Therefore, the ALJ's citation to her limited work activities she performs at home online does not support a conclusion that she can engage in substantial gainful activity on a full-time basis.

The second reason given by the ALJ for discrediting Washington's testimony is that her alleged impairments are not supported by medical records. (A.R. 28.) Here, the ALJ references Washington's testimony that she was on bed rest for three days during the week before the hearing. (Id.) While there is no medical evidence in the record that specifically confirms that Washington spent three days on bed rest because of severe dizziness, her testimony is consistent with a diagnosis of Meniere's disease and treatment notes indicating she had similar episodes of dizziness in the past. Although the ALJ's logic is sketchy, he appears to assume that Washington is lying about her symptoms because she undertook bed rest without a physician ordering that treatment. But that is like disbelieving a claimant with hip pain because she uses a cane even though her physician did not prescribe one. Such reasoning, as the Seventh Circuit pointed out, is "absurd." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

The ALJ also discredited Washington's testimony because the medical diagnostic tests, which included "Brain/Head" and "EEG" testing, produced normal results and did not support her allegations. (A.R. 28.) However, these types of tests do not confirm a diagnosis

of Meniere's disease.[3]  The ALJ failed to consider and discuss the results of Washington's

ENG, which Dr. Rubenfeld noted produced abnormal results indicating nystagmus that was

secondary to a central cause.  (Id. at 375, 379.)  Dr. Rubenfeld diagnosed Washington as

having Meniere's disease, prescribing a treatment plan that included medication and a low-

salt diet, and ruling out other conditions.  (Id. at 379.)

The ALJ also found Washington's testimony lacking in credibility because she

allegedly refused vestibular rehabilitation physical therapy.  (A.R. 28.)  Regarding

Washington's failure to follow up on Dr. Rubenfeld's recommended physical therapy, the

Seventh Circuit has instructed:

> In assessing credibility, infrequent treatment or failure to follow a treatment
> plan can support an adverse credibility finding where the claimant does not
> have a good reason for the failure or infrequency of treatment.  However, the
> ALJ must not draw any inferences about a claimant's condition from this
> failure unless the ALJ has explored the claimant's explanations as to the lack
> of medical care.  An inability to afford treatment is one reason that can provide
> insight into the individual's credibility.

*Craft*, 539 F.3d at 679.  Here, the ALJ never questioned Washington at the hearing as to her

reasons for not following through with physical therapy.  And this court's review of the

record shows there is evidence that Washington may not have had medical insurance.  (Id.

---

[3]  There is no diagnostic test for Meniere's disease.  An audiogram and gadolinium-enhanced MRI can be used to rule out other causes.  A diagnosis is made clinically and is primarily one of exclusion.  The Merck Manuals Online Medical Library, http://www.merck.com/mmpe/sec08/ch086/ch086f.html.

at 368.) Accordingly, the ALJ cannot rely on Washington's lack of treatment in finding her allegations not credible.

Finally, in assessing Washington's credibility, the ALJ summarily discredited her testimony regarding her subjective complaints because her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (A.R. 28.) But in the preceding discussion "above" the ALJ did not address Washington's descriptions of the limiting effects of her impairments. As Washington points out, SSR 96-7p requires an ALJ to take a number of factors into account in assessing a claimant's credibility, including the claimant's descriptions of her symptoms, any measures she uses to treat those symptoms, and her daily activities. 1996 WL 374186, at *5. For example, Washington testified that since 2004, she has experienced dizziness so debilitating that she was required to be on bed rest one to two times each month. (A.R. 472.) Washington also explained that she took online college courses because stress exacerbates her dizziness. (Id. at 474-75.) Here, the ALJ did not address those statements, let alone explain why he found them not credible.

Furthermore, the ALJ's conclusory statement that he rejected Washington's descriptions of her symptoms "to the extent they are inconsistent with the above residual functional capacity assessment" raises the concern that he discounted her credibility simply because her testimony did not mesh with his view of her RFC. As the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that

do not "turns the credibility determination process on its head." *Brindisi*, 315 F.3d at 787-88. The ALJ is required to assess a claimant's credibility *before* developing the RFC. *Id.* at 788. Indeed, the ALJ himself recognized this requirement and noted this in his opinion. (A.R. 28.) Given the ALJ's failure to analyze Washington's testimony regarding her symptoms and daily activities, this court cannot be sure that he evaluated her credibility independently rather than dismissing her testimony to the extent that it did not fit neatly within his RFC assessment.

**F.    Breen's Testimony**

Washington contends that the ALJ failed to discuss Breen's testimony that favored a finding that she is disabled and unable to sustain work on a full-time basis. (Pl.'s Mem. at 15-17.) Specifically, Washington avers that the ALJ did not discuss all of the limitations, including her frequent battles with vertigo, that she took online college courses because her symptoms increased when she took courses on campus, and that stress exacerbated her condition. (Id.) Washington further asserts that the ALJ failed to discuss why he found that her symptoms would cause her to be absent from work only one day per month when she testified that she spent nine days on bed rest during the month before the hearing. (Id.) Washington points out that Breen testified that an individual who is absent from work 10 to 12 days per year is not capable of sustaining full-time employment. (Id.)

In response, the Commissioner asserts that because the ALJ did not find that Washington would be absent from work for more than 10 to 12 times per year, he was not

required to include that limitation in the hypothetical question or discuss Breen's testimony regarding multiple absences. (Def.'s Resp. at 9-10.) Accordingly, the Commissioner contends that Breen's testimony constitutes substantial evidence supporting the ALJ's decision that Washington can perform her past relevant work. (Id.)

The court finds that the ALJ's hypothetical question to Breen was flawed and a remand on this issue is warranted to the extent that the ALJ's RFC assessment requires a remand. When an ALJ relies on testimony from a VE, the "hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). But here, the ALJ's hypothetical question did not account for the expected frequency of Washington's absenteeism given the unpredictable nature of her symptoms. Nor did he explain why he disbelieved Washington's testimony that she was confined to bed rest for nine days in the month before the hearing.

On remand, after the ALJ reassesses Washington's RFC and conducts a new credibility analysis, he should explain whether he believes her testimony that she has periods of dizziness that are severe enough to confine her to bed rest. If so, the ALJ should incorporate whatever limitations he finds credible in the VE's hypothetical. If he does not believe her, the ALJ should identify what evidence supports his conclusion that she would only miss work once a month.

## Conclusion

For the foregoing reasons, Washington's motion for summary judgment is granted and this case is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

**ENTER:**

_____
**Young B. Kim**
**U.S. Magistrate Judge**